NO.
12-06-00007-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

§          APPEAL
FROM THE 

IN THE INTEREST OF

§          COUNTY
COURT AT LAW

C.L.L., A CHILD

§          NACOGDOCHES
COUNTY, TEXAS

                                                                                                                                                           


MEMORANDUM OPINION

            Appellant
Cheryl Ann Leatherman appeals the trial court’s order modifying the
parent-child relationship.  Cheryl
presents five issues.  We affirm.

 

Background

            Cheryl
and Daniel Craig Leatherman were divorced on July 20, 2004 and are the parents
of C.L.L., born June 24, 1998.  In the
decree of divorce granted by the Cherokee County Court at Law, Cheryl and
Daniel were appointed joint managing conservators of C.L.L.  Cheryl was granted the exclusive right to
establish the primary residence of the child. 
Further, Cheryl was ordered to establish C.L.L.’s primary residence
within Nacogdoches, Texas or any contiguous county until Cheryl’s anticipated
graduation from college in May 2005. 
After May 2005, Cheryl’s only restriction in establishing C.L.L.’s primary
residence was that she not move out of Texas. 
The divorce decree also stated that both Cheryl and Daniel agreed that,
after May 2005, the parties would have equal rights to request further action
by the trial court regarding the child’s domicile restrictions.  Daniel was granted access to C.L.L. according
to a standard possession order and was ordered to pay child support to Cheryl. 

            On
April 22, 2005, less than one year after the divorce, Daniel filed a motion to
modify the parent-child relationship and a motion to transfer the case to
Nacogdoches County.  Cheryl filed an
original answer and a countermotion to modify. 
Daniel’s motion to transfer was granted. 
On April 28, 2005, Daniel filed a first amended motion to modify
that included a supporting affidavit.  In
the affidavit, Daniel stated that Cheryl advised him that she planned to move
to her parents’ home in Sugarland, Texas in July 2005.  On July 25, Daniel filed a third amended
motion to modify, which included an affidavit pursuant to section 156.102 of
the Texas Family Code.  As in his
original, first amended, and second amended motions, Daniel alleged that the
circumstances of the child, a conservator, or other party affected by the order
to be modified had materially and substantially changed since the date of
rendition of the divorce decree.  Daniel
alleged in an accompanying affidavit that C.L.L.’s present living environment
might endanger her physical health or significantly impair her emotional
development.  Consequently, Daniel requested  that he be appointed primary joint managing
conservator of C.L.L. with the right to establish her legal domicile and
residence or, alternatively, that C.L.L.’s domicile be restricted to
Nacogdoches or Angelina Counties. 
Finally, Daniel alleged that modification was in the child’s best
interest.

            On
July 25, the parties agreed to temporary orders that did not change the child’s
school enrollment during the pendency of the proceedings.  On August 1, 2, and 12, the trial court heard
Daniel’s motion to modify.  On October
13, the trial court ordered modification of the parent-child relationship,
finding that the material allegations in the motion to modify were true and
that modification was in the best interest of the child.  The trial court appointed Daniel primary
joint managing conservator of C.L.L. and granted him the exclusive right to
establish the primary residence of the child within Angelina County or any
county south of Angelina County that would decrease the distance between Daniel’s
residence and Cheryl’s residence in Fort Bend County.  Cheryl was granted access to C.L.L. according
to a standard possession order and was ordered to pay child support to Daniel. 








            On
November 1, the trial court filed findings of facts and conclusions of
law.  Cheryl filed a motion to modify the
judgment, or alternatively, a motion for new trial, alleging that newly
discovered evidence justified the entry of a modified judgment, or
alternatively, that errors were committed that warranted a new trial.  The trial court heard Cheryl’s motion on
December 21.  On the following day, the
trial court issued a letter ruling stating that it would modify its judgment
and order a status hearing in the summer of 2006 to determine whether the
current placement was in the best interest of the child.  The letter also stated that “[a]ny
modifications that are needed [would] be made at that time.”  Cheryl presented the trial court with an
order, which the trial court did not sign. This appeal followed.

 

Section
156.102 of the Texas Family Code

            In
her first issue, Cheryl argues that because Daniel initiated his suit for
modification within one year after the order to be modified was rendered,
section 156.102 of the Texas Family Code governed his suit.  Therefore, Cheryl contends that Daniel was
required to prove the statutory allegations contained in his affidavit at trial
and meet a heightened burden of proof as contemplated by the statute.  Daniel disagrees, stating that section
156.102 of the Texas Family Code contains no reference to a burden of proof and
functions solely as a threshold requirement. 
Alternatively, Daniel contends that no extra burden was required because
a trial on the merits was held after the expiration of the one year period
following rendition of the order to be modified.

            In
her second issue, Cheryl argues that the trial court abused its discretion in
modifying custody because there was no evidence, or alternatively insufficient
evidence, to support the allegations in Daniel’s affidavit that the child’s
present environment might endanger her physical health or significantly impair
her emotional development.  Daniel
responds that he is not required to prove the allegations contained in his
affidavit. 

Applicable Law








            We
review conclusions of law de novo.  In
re A.S.M., 172 S.W.3d 710, 713 (Tex. App.–Fort Worth 2005, no
pet.).  Section 156.102 of the Texas
Family Code states that if a suit seeking to modify the designation of the
person having the exclusive right to designate the primary residence of a child
is filed not later than one year after the date of the rendition of the order,
the person filing the suit shall execute and attach an affidavit.  Tex.
Fam. Code Ann. § 156.102(a) (Vernon Supp. 2006). The affidavit must
contain, along with supporting facts, at least one of the following
allegations: (1) that the child’s present environment may endanger the child’s
physical health or significantly impair the child’s emotional development; (2)
that the person who has the exclusive right to designate the primary residence
of the child is the person seeking or consenting to the modification and the
modification is in the best interest of the child; or (3) that the person who
has the exclusive right to designate the primary residence of the child has
voluntarily relinquished the primary care and possession of the child for at
least six months and the modification is in the best interest of the
child.  Id. §
156.102(b).  However, the trial court
shall deny the relief sought and refuse to schedule a hearing for modification
unless the court determines, on the basis of the affidavit, that facts adequate
to support an allegation pursuant to subsection (b) are stated in the
affidavit.  Id. § 156.102(c).  If the court determines that the facts stated
are adequate to support an allegation, the court shall set a time and place for
the hearing.  Id. §
156.102(c). 

            The
purpose of section 156.102 is to “promote stability in the conservatorship of
children by preventing the relitigation of custodial issues within a short
period of time after the custody order is entered.”  In re A.S.M., 172 S.W.3d at 715
(quoting In re R.C.S., 167 S.W.3d 145, 148 (Tex. App.–Dallas
2005, pet. denied)).  Such relitigation
is discouraged through the imposition of a heightened standard of verified
pleading.  Burkhart v. Burkhart,
960 S.W.2d 321, 323 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).  Section 156.102 requires that the trial court
initially determine whether the facts sworn to in the affidavit supporting the
motion to modify justify a hearing.  See
Mobley v. Mobley, 684 S.W.2d 226, 229 (Tex. App.–Fort Worth 1985,
writ dism’d).  If the trial court sets
and hears the motion to modify, that is proof that the trial court regarded the
affidavit as adequate.  In re
J.K.B., 750 S.W.2d 367, 368 (Tex. App.–Beaumont 1988, no writ).  However, if the motion is not presented to
the trial court within the one year period following the initial custody order,
such motion can then be set for hearing and a hearing can be had as if it were
a motion to modify under any other relevant section of the Texas Family Code
that does not require a section 156.102 affidavit. Jilek v. Chatman,
613 S.W.2d 558, 559-60 (Tex. Civ. App.–Beaumont 1981, no writ).

Analysis

            Although
Daniel filed his original, first amended, and second amended motions before one
year after the date of the rendition of the final order, he filed his third
amended motion after the one year period. 
The third amended motion substitutes for and supersedes all three
previous motions.  See Tex. R. Civ. P. 65.  Because Daniel’s third amended motion was
filed more than one year after the date of the rendition of the final order,
section 156.102 of the Texas Family Code did not apply.  Therefore, Cheryl’s first issue is
overruled.  Having overruled Cheryl’s
first issue, we need not consider her second issue pertaining to the
sufficiency of the evidence supporting the allegations in Daniel’s affidavit.

 

Modification

            In
her third and fourth issues, Cheryl contends that the trial court abused its
discretion in modifying custody because there was no evidence, or alternatively
insufficient evidence, to support Daniel’s allegations that the circumstances
of the parents or the child had materially and substantially changed since the
date of the prior order or that the modification was in the best interest of
the child. 

Applicable Law

            A
trial court’s modification of conservatorship is reviewed for abuse of
discretion.  In re P.M.B.,
2 S.W.3d 618, 621 (Tex. App.–Houston [14th Dist.] 1999, no pet.).  It is an abuse of discretion for a trial
court to rule without supporting evidence. 
Id.  Under an abuse
of discretion standard, the legal and factual sufficiency of the evidence are
not independent grounds of error, but are relevant facts in assessing whether
the trial court abused its discretion.  In
re Ferguson, 927 S.W.2d 766, 769 (Tex. App.–Texarkana 1996, no
writ).  The trial court’s findings of
fact are binding on an appellate court unless they are so contrary to the great
preponderance of the evidence as to show a clear abuse of discretion.  Id. 
In the absence of such a clear abuse of discretion, an appellate
court should not substitute its judgment for that of the trial court. Id.

            The
best interest of the child is the primary consideration in determining
conservatorship or residency of a minor child. 
Villasenor v. Villasenor, 911 S.W.2d 411, 419 (Tex. App.–San
Antonio 1995, no writ).  According to
section 156.101 of the Texas Family Code, the trial court may modify an order
or portion of a decree that provides for the appointment of a conservator of a
child, that provides the terms and conditions of conservatorship, or that
provides for the possession of or access to a child if (1) modification would
be in the best interest of the child and (2) the circumstances of the child,
conservator, or other party affected by the order have materially and
substantially changed since the date of the rendition of the order.  Tex.
Fam. Code Ann. § 156.101 (Vernon Supp. 2006). Whether there has been a
material and substantial change of circumstances affecting the child is
normally to be determined by an examination of the evidence of changed
circumstances occurring between the date of the order or judgment sought to be
modified and the date of the filing of the motion to modify.  Gibbs v. Greenwood, 651 S.W.2d
377, 379 (Tex. App.–Austin 1983, no writ).

            Relocation,
regardless of distance, will not suffice to establish a material and
substantial change in circumstances.  In
re A.C.S., 157 S.W.3d 9, 22 (Tex. App.–Waco 2004, no pet.) (quoting Bates
v. Tesar, 81 S.W.3d 411, 430 (Tex. App.–El Paso 2002, no pet.)).  Such a decision is necessarily fact intensive
and case law indicates that certain factors should be considered by an
appellate court.  Id.  These factors include the quality of the
relationship between the noncustodial parent and the child, the nature and
quality of the child’s contacts with the noncustodial parent, both de jure and
de facto, whether the relocation would deprive the noncustodial parent of
regular and meaningful access to the child, the impact of the move on the
quality and quantity of the child’s contact with the noncustodial parent, the
motive for the move, the motive for opposing the move, the feasibility of
preserving the relationship between the noncustodial parent and the child through
suitable visitation arrangements, and the proximity, availability, and safety
of travel arrangements.  Id.

Findings of Fact and Conclusions of
Law

            In
its findings of fact, the trial court found as follows:

 

1.             The
circumstances of the child, a conservator, or other party affected by the
previous order to be modified had materially and substantially changed since
July 20, 2004. 

 

2.             Cheryl’s
residence in Sugarland, Texas was greater than 100 miles from Daniel’s residence
in Lufkin, Texas.

 

3.             Juana
Morgan was a licensed professional counselor and had counseled C.L.L. for
approximately one and one-half years.

 

4.             Morgan’s
opinion was that Daniel was suitable and appropriate to be named as the
custodial parent of C.L.L.

 

5.             A
social study was completed during the lawsuit by Mark A. Sutton by the
agreement of counsel for each party and approved by the trial court.

 

6.             Mark
A. Sutton was a licensed professional counselor and interviewed both parties,
the child, and witnesses as part of his investigation.  He also visited and inspected both
residences.

 

7.             Sutton’s
ultimate opinion was that C.L.L.’s primary residence should be established by
Daniel. 

 

8.             Scott
Sexton, Cheryl’s boyfriend, spent several nights overnight in Cheryl’s
residence while C.L.L. was present in January 2005. 

 

9.             C.L.L.
was taken to a medical physician for bedwetting during the month of January
2005.

 

10.          Both
parents actively participated in C.L.L.’s schooling and extracurricular
activities.

 

11.          The
needs, physical and otherwise, of C.L.L. would be met in Daniel’s home.

 

 

            In
its conclusions of law, the trial court concluded that modification was in
C.L.L.’s best interest and that appointing Daniel as the primary joint managing
conservator with the right to establish the primary residence and domicile was
in C.L.L.’s best interest.

The Evidence

            At
trial, Cheryl testified that she had moved from Nacogdoches to live in
Sugarland with her parents.  At that
time, she was  employed from 8:00 a.m. to
5:00 p.m.  If she was awarded custody,
C.L.L. would be enrolled in day care and a service would pick up the child from
school and keep her until Cheryl picked her up after work.  Morgan stated that Cheryl seemed very excited
about moving and expressed no concerns that moving would be a problem for
C.L.L.  Sutton described the travel from
Lufkin to Sugarland as a “considerable distance.”

            Daniel
testified that he and C.L.L. did a lot of things together and that he took her
to school on the days he had possession. 
Daniel testified that he had a problem being separated from C.L.L.
because of their bond, stating that it would devastate both of them.  He believed that a move would emotionally
harm C.L.L.  If C.L.L. were allowed to
move to Harris County,[1] he would not be able to participate
in her day to day life or her extracurricular activities.  In Morgan’s opinion, moving would disrupt the
comparative comfort, ease, and frequency of C.L.L.’s relationship with Daniel.
According to Morgan, C.L.L. had bonded with both parents, but seemed more
relaxed and affectionate with her father. 
Morgan believed Daniel was better able to empathize with C.L.L. and was
more respectful of her feelings.  She saw
C.L.L. as a “daddy’s girl”and stated that it would be traumatic for C.L.L. to
have to move and leave her father. 
Morgan stated that, in her opinion, C.L.L. could handle the move, but
that it would add to C.L.L.’s stress because of her recent difficulty in
school.  According to Sutton, Daniel had
a “tremendous bond” with C.L.L. Sutton’s recommendation was that Daniel be
appointed C.L.L.’s primary caretaker because of school stability and concerns
about Cheryl’s involvement with Scott Sexton. 
Both Morgan and Sutton testified that C.L.L. consistently told them that
she wanted to stay with her father. 
Cheryl admitted that C.L.L. may have said she wanted to stay with her
father.

            Morgan
stated that Cheryl was critical of Daniel’s care of C.L.L., stating that C.L.L.
was sad and bored because she spent time at the country club with no one to
take care of her and had to “hang out” without supervision.  Cheryl stated in her interrogatories that
Daniel’s interactions with C.L.L. were usually brief and shallow.  Her fear was that when C.L.L. was with
Daniel, he usually had someone else taking care of her.  However, C.L.L. told Morgan that she loved
going to the golf course and that she spent most of her time with Daniel.  Cheryl also complained that Daniel had few
parenting skills, especially regarding C.L.L.’s diet.  Daniel believed that Cheryl made too much of
C.L.L.’s weight, but admitted that he was also concerned.  Cheryl stated that she was concerned about
C.L.L.’s being around Daniel’s girlfriend’s son.  Daniel admitted that his relationship with
his girlfriend was serious, but said they had no plans to marry.  Daniel acknowledged that his girlfriend’s son
painted graffiti on some mobile homes at the mobile home park where he
lived.  However, Daniel stated that the
boy also washed off the graffiti and was punished harshly. 

            Regarding
his employment, Daniel stated that he had been offered a position at the
alternative school with much better working hours.  He also noted that he had turned down
numerous coaching positions during the pendency of this case.  Cheryl’s father testified that Daniel’s job
was time consuming, that he was selfish, and that he did not spend time with
his family.  At least one person involved
with C.L.L.’s soccer team complained that Daniel “babied” C.L.L., did not
attend the majority of soccer practices, and did not sit with the soccer
mothers during the practices or the games.      

            Regarding
Cheryl’s relationship with C.L.L., Morgan stated that Daniel was concerned that
Cheryl was overly structured and had a very regimented parenting style.  Morgan stated that Cheryl stressed structure
and organizing activities for C.L.L.  She
also testified that C.L.L. wanted to please Cheryl and was very concerned at
times about making her mother mad, indicating that sometimes she did not
believe she could please Cheryl.  Sutton
believed that Cheryl and C.L.L. had a very good relationship, but that Cheryl
was stricter with the child than Daniel and had a very different style of
parenting that was a “bit rigid.”  He
also had some concerns because C.L.L. became more disturbed than she should
have over a missing marshmallow in her room. 
Sutton believed that Cheryl did not have a lot of empathy for C.L.L. and
did not understand that she was basically a “daddy’s girl.”  

            Both
parents stated that C.L.L. was on medication. 
Daniel stated that C.L.L. had asthma, but Cheryl characterized C.L.L.’s
condition as “breathing problems.” 
Cheryl denied that secondhand smoke aggravated C.L.L.’s condition and
testified that her parents smoked outside the house.  Daniel did not believe it was in the best
interest of C.L.L. to be in a smoke filled area and had witnessed Cheryl’s
mother smoke in the house and in the car. 
Sutton stated that because of her asthma, C.L.L should never be in an
environment where there was smoke.  The
family doctor told Sutton that three quarters of the time Daniel brought C.L.L.
to see him, he equated it with a visit when Cheryl had the child at her parents’
house. 

            Regarding
Cheryl’s relationship with Scott Sexton, he admitted that they met on the
internet.  Cheryl stated that Sexton
visited her in January 2005, spent five to seven days in a motel, and
approximately two weeks at her apartment after becoming ill.  Cheryl denied that Sexton was around C.L.L.
all the time.  During that time, C.L.L.
had several bedwetting incidents. 
Because C.L.L. had a history of urinary tract infections, Cheryl and
Daniel took her to a urologist in January 2005. However, the physician found no
physical cause for C.L.L.’s bedwetting. 
After C.L.L. wet her bed in mid-January 2005, Daniel asked Cheryl if a
man was staying there.  According to
Daniel, Cheryl stated that he only stayed one night.  Sutton noted that Cheryl never mentioned
Sexton until the last ten minutes of her interview.  Sexton testified that he cared for Cheryl and
that he was attempting to find employment in Houston to pursue their
relationship.

            Cheryl
could not remember when she first learned that C.L.L. was scared of Sexton, but
believed it was toward the end of January 2005. According to Cheryl, C.L.L.
told her that someone informed her that if Sexton was there, he was going to
look at her private parts while she was sleeping.  Morgan testified that, in February 2005,
Cheryl brought C.L.L. to her office because the child had been having
behavioral problems in school.  Cheryl
believed that Daniel and C.L.L. had been playing too roughly.  According to Morgan, C.L.L. told her that she
had a problem with Sexton and did not like him. 
C.L.L. told Morgan that she did not like Sexton coming in the way he
did, that she did not know him, that she did not like his being there, and that
there was something about him that she did not like.  Further, C.L.L. stated that she did not “like
them all being asleep there together” and that it was hard for her to sleep.

Analysis

            From
this evidence and the record, the trial court reasonably could have concluded
that Cheryl’s new residence and work hours, her new boyfriend and C.L.L.’s
adverse reaction to him, and her moving more than one hundred miles from Daniel’s
residence since the rendition of the final decree of divorce constituted a
material and substantial change of circumstances.  See In re P.M.B., 2 S.W.3d at
621.  Further, there was extensive
testimony regarding the special relationship between Daniel and C.L.L. and the
fact that such a move, characterized by Sutton as a “considerable distance,”
would have an adverse effect on that relationship.  See In re A.C.S., 157 S.W.3d at
22.  Thus, the trial court did not abuse
its discretion in finding that the material allegations in Daniel’s motion to
modify were true.

            Regarding
C.L.L.’s best interest, the trial court could have considered evidence showing
that C.L.L. was very attached to Daniel even though she also loved Cheryl.  The trial court could have found that moving
C.L.L. from Daniel would prove emotionally harmful and also  physically harmful because Cheryl’s household
included persons who smoked and C.L.L. has asthma.  Further, Morgan stated that a move would
disrupt the comparative comfort, ease, and frequency of C.L.L.’s relationship
with Daniel and that Daniel was better able to empathize with the child.  Moreover, Sutton recommended that the trial
court grant primary custody to Daniel and emphasized the importance of C.L.L.’s
relationship with Daniel, referring to it as a “tremendous bond.”  Although the decision was “a close call,” the
trial court recognized that Daniel’s hours of employment would not require
C.L.L. to be in day care.  Finally,
Morgan and Sutton stated that C.L.L. said she wanted to live with Daniel.  All this evidence supports a finding that
modification was in the child’s best interest. 
Although there was some evidence in the record that was favorable to
Cheryl, we conclude that the trial court did not abuse its discretion in
finding that modification was in C.L.L.’s best interest.  See Villasenor, 911 S.W.2d at 419.

            In
her brief, Cheryl also contends that the trial court erred in placing any
weight on Sutton’s evidence, testimony, or opinions.  However, Cheryl did not object to Sutton’s
evidence, testimony, or opinions during trial. 
Therefore, she has waived this argument on appeal.  See Tex.
R. App. P. 33.1(a)(1)(A). 
Accordingly, Cheryl’s third and fourth issues are overruled.

 

Ruling on
Postjudgment Order

            In
her fifth issue, Cheryl contends that the trial court abused its discretion by
failing or refusing to sign an order after granting her postjudgment motion to
modify the judgment, or alternatively motion for new trial, thereby allowing
the motion to be overruled by operation of law. 
In its letter ruling on the motion, the trial court stated as follows:

 

The Court will
modify its judgment and order that a status hearing be held in the summer of
2006, prior to the next school year starting, to determine whether the current
placement is in the best interest of the child. Any modifications that are
needed will be made at that time.

 

 

However, in her brief, Cheryl states
that the trial court ruled it would modify the October 13, 2005 judgment and
consider further evidence during the summer of 2006.  Cheryl’s proposed order  stated that the court found that Cheryl’s
motion should be granted in part, and denied in part, as follows:

 

1.             IT IS
ORDERED that the “Order in Suit Affecting Parent-Child Relationship” signed by
this Court on October 13, 2005 is hereby set aside.

 

2.             IT IS
FURTHER ORDERED that the terms of the Court’s “Order in Suit Affecting
Parent-Child Relationship” signed on October 13, 2005 by this Court, shall be
converted to a temporary order with all terms therein to be made temporary, and
with the Court retaining jurisdiction to reconsider the modification of these
temporary orders in the Summer of 2006, and prior to the beginning of the 2006
Fall school term.  IT IS FURTHER ORDERED
that at said time the Court, after considering further presented evidence on
the merits, shall enter modification of the present orders of the Court as
needed and in the best interest of the child, [C.L.L.].

 

 

            Cheryl’s
proposed order did not conform to the trial court’s letter ruling.  The trial court’s ruling modified the
judgment by ordering a status hearing in the summer of 2006 to determine if any
changes in the child’s current custody arrangement were needed, but did not
contemplate that its order would be set aside or that it would issue temporary
orders.  Because Cheryl’s proposed order
did not conform to the trial court’s letter ruling, the trial court did not
abuse its discretion by failing or refusing to sign Cheryl’s proposed
order.  Accordingly, Cheryl’s fifth issue
is overruled.

 

Disposition

            The
judgment of the trial court is affirmed.

 

 

 

                                                                                                   JAMES T. WORTHEN   

                                                                                                               Chief Justice

 

 

Opinion
delivered July 18, 2007.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)











[1] During Cheryl’s testimony, she stated that she
was contemplating moving to an apartment in Kingwood, Harris County, Texas.